J-S32027-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
TYRELL GILES :
:
Appellant : No. 227 MDA 2022

Appeal from the Judgment of Sentence Entered August 11, 2021
In the Court of Common Pleas of Lebanon County Criminal Division at
No(s): CP-38-CR-0000992-2020

BEFORE: PANELLA, P.J., BENDER, P.J.E., and LAZARUS, J.

MEMORANDUM BY BENDER, P.J.E.: **FILED DECEMBER 21, 2022**

Appellant, Tyrell Giles, appeals from the aggregate judgment of
sentence of 11½—25 years' incarceration, imposed after a jury convicted him
of two counts of aggravated assault, recklessly endangering another person,
and possessing instruments of crime.[1]  After careful review, we affirm.

In its opinion dismissing Appellant's post-sentence motions, the trial
court provided a summary of the facts adduced at his May 26, 2021 jury trial
as follows:

> At the jury trial, Chief Harold Easter of the Norther Lebanon
> Township Police Department testified that he was on duty on July
> 16, 2020[,] and responded to a dispatch to Martin Drive in North
> Lebanon Township for a report of a person bleeding on a lawn in
> a residential neighborhood.  When he arrived at the location, he
> observed a male l[]ying in the grass just off the pavement.  He
> was not wearing a shirt, there was a wound on the lower right side
> of his back, and he was bleeding.  The man was identified as

---

[1] Respectively, 18 Pa.C.S. §§ 2702(a)(1), 2702(a)(4), 2705, and 907(a).

Jarrod Sales.  Sales told Chief Easter that he had been at the Mobil[] Gas Station at 121 and Cumberland Streets in the City of Lebanon when an individual approached him and stabbed him. Sales said he had never seen the person who stabbed him before.

Sales' vehicle was parked on the street adjacent to where he was l[]ying.  When Chief Easter looked inside the vehicle, he observed thick, coagulated blood on the right side of the driver's seat.  He was able to observe Sales' wound when he and other officers applied a compress bandage and pressure to try to stop the bleeding.  Chief Easter explained that he had served in combat in the military and had been in law enforcement since 1969, with 46 years' experience instructing other police officers in defensive tactics, the use of weapons, and wounds.  One of those courses involved edged weapons.  He explained that the difference between a knife or stab wound and a puncture wound is that a puncture wound would be round/circular and jagged and would be caused by something like a re-rod or glass.  A knife wound would be long and thin.  Chief Easter explained that it appeared that Sales had been lacerated with a sharp object as the wound was smooth and narrow with clean edges.  Based on his training and experience, Chief Easter opined that it was consistent with a wound caused by a knife or a[n] edged[ ]weapon.  Chief Easter also noted that in addition to the back wound, the victim had recent abrasions on his lower legs.

Due to the fact that the incident occurred in the City of Lebanon, the Lebanon City Police Department took over the investigation at that point and the North Lebanon Township Police had no further involvement.  Chief Easter identified a series of photographs which were taken of Sales and his vehicle on July 16, 2020 (Exhibits "1A through 1G")[,] and a Powerpoint which had been prepared for the jury trial[] (Exhibit "2")[.]

On cross-examination, Chief Easter acknowledged that he had never received any medical training.  However, he explained on re-direct that he has observed many people who had been stabbed throughout his career.  Based on his training and experience, he found that Sales' wound was consistent with a stab wound.  He also reiterated that Sales told him at the scene that he had been stabbed.

Sergeant Keith Uhrich of the Lebanon City Police testified that on July 16, 2020[,] at approximately 12:40 p.m.[,] he was dispatched to the gas station at 1201 Cumberland Street due to a

- 2 -

report of a stabbing having occurred there. Sergeant Uhrich identified a Powerpoint diagram which showed the layout of the gas station and the surrounding area[] (Exhibits "3A through 3N")[.] He also identified a series of photographs which he had taken at the scene[] (Exhibits "4A through 4K")[.]

Sergeant Uhrich personally retrieved the surveillance video of the incident from the gas station[] ( Exhibit "S")[.] The video was played at the jury trial. In the video, Sergeant Uhrich pointed out that Sales could be seen pulling into the gas station and parking his vehicle. Then a black car pulls into the parking lot from 12th Street. Before the black car was entirely inside the parking lot, a male jumped out and ran toward the gas pumps where Sales was standing. Sales began to run[,] and the male pursued him toward a red truck in the parking lot. During this time, the female driver parked the black car near the front of the store. After Sales' hat and shoes fell off, he ran back toward the gas pumps. The male continued to chase him, keeping his hand in his right pocket the entire time. The male ultimately pulled his hand out of his pocket and could be seen making a folding motion, swinging his hand into the right back side of Sales. After that, the male continued to pursue Sales, finally ending up on top of him and continuing the assault.

The jury was also shown a frame-by-frame surveillance video taken from another angle which focused on the assault. The male from the black car could be seen making a stabbing motion into Sales. Prior to that point, Sales' shirt was entirely white and had no blood on it. After the male made those motions, a blood spot appeared on Sales' shirt. The spot of blood began to get larger and the shirt became soaked in blood. During the pursuit, the male kept his hand in his right pocket. At the end of the incident, the male's hand could be seen reaching for the ground. The male kept his left hand balled up as he reached over to his right hand and his right hand returned to his pocket. There appeared to be something hanging or sticking from the male's right hand.

Eventually, Sales was able to push the male off and the male returned to the black vehicle. After he got up, Sales went into the gas station and watched out the window. After the black car pulled out of the parking lot onto Cumberland Street, Sales exited the gas station, picked up his shoes and hat[,] and got into his own vehicle. He drove out of the parking lot heading north on 12th Street, but left his bloody shirt by the red truck in the parking lot.

When Sergeant Uhrich processed the crime scene, he located Sales' bloody shirt. He identified the shirt (Exhibit "7") and a series of photographs of the shirt which showed a smooth slice through the back[] (Exhibit "8")[.] One of the photographs showed the trail of blood and a pool of blood where Sales had been l[]ying in the parking lot while he was pinned down by the male. Sergeant Uhrich explained that they were unable to find a knife, weapon, or anything else near the gas pumps which could have caused Sales' injury. However, he noted that this was not unusual as "people usually take their weapons with them." []N.T. [Jury Trial, 5/26/21,] at 57[.]

Sergeant Uhrich explained that he first learned [Appellant]'s identity through an anonymous call to the Police Department. The caller informed the police that the driver of the black car was Ashley Nunemaker[,] and that she was with a man named Lamar. When they pulled [Appellant]'s full legal name, it was discovered that his middle name is Lamar. [Sergeant Uhrich] obtained a picture of [Appellant] and compared it to the surveillance video to determine that they were the same person. When Sergeant Uhrich eventually interviewed [Appellant], [he] admitted to being the passenger in the black car. He also informed Sergeant Uhrich that the car was driven by a female named Ashley.

Sergeant Uhrich visited Ashley Nunemaker at her home the day after the incident. Nunemaker allowed the police to search her home for [Appellant] but he was not there. The police also searched Nunemaker's black Nissan, which was the car seen on the video, but found no knives or weapons. Nunemaker returned to the police station to make a statement and identified [Appellant] from a photographic lineup as the person who was with her at the gas station the previous day[] (Exhibit "9")[.] [Appellant]'s picture and a description of the incident were released to the press and posted on social media. [Appellant]'s state parole officer was also notified. [Appellant] turned himself in to the police on July 19, 2020. Sergeant Uhrich interviewed [Appellant] at that time and made an audio record[ing] of the interview[] (Exhibits "11A" and "11B")[.]

[Appellant] told Sergeant Uhrich that he had turned himself in because his family, friends, and state parole officer told him he was wanted for a stabbing, but he claimed that he did not know anything about the incident. Sergeant Uhrich explained to [Appellant] what could be seen on the gas station surveillance video and described the severity of Sales' injuries to him.

- 4 -

[Appellant] admitted that he was at the scene but denied using a knife on Sales: "I don't remember no stabbing."  []N.T. Jury Trial[,] 5/26/21[,] at 73[.]  [Appellant] further admitted that he chased Sales throughout the gas station, that Sales fell, and that the two were tussling.  He repeatedly described the entire day as a blur and stated that he did not recall the stabbing.  He also acknowledged that on July 16, 2020, he had received a phone call from a female who informed him that Sales had to go to the hospital.  However, he denied that he had a weapon or that he stabbed Sales.

Sergeant Uhrich also identified photographs taken of Sales' car[] (Exhibit[s] "12A" and "12B")[.]  When Sergeant Uhrich compared the slice in Sales' shirt (Exhibit "8") to the scar on Sales' back, he noted that both had clean edges with an arc to the left.

On cross-examination, Sergeant Uhrich acknowledged that [Appellant] told him that his phone was missing when [Appellant] came in to be interviewed.  On redirect, however, Sergeant Uhrich noted that [Appellant] had also told him that his mother and other individuals had called to let him know that he was wanted for a stabbing.

Jarrod Sales testified that around lunchtime on July 16, 2020, he was at the gas station and had parked his car at a gas pump.  He was wearing a white tee[-]shirt and sneakers with the laces untied. As he was pumping gas, a man ran toward him and chased him to a red truck in the parking lot.  Sales then ran back toward his car.  Sales explained[,] "I mean, I don't remember it.  Like, all this shit was just a blur to me[,]" and that, ["]when I woke up in the hospital, that's when, like, people told me what happened." []N.T. Jury Trial[,] 5/26/21[,] at 100[.]  He confirmed that it was him on the video and that he did not have any injuries prior to the attack.  He explained that he spent seven days in the hospital, that he had surgery on his stomach as a result of his injuries, and that his hospital bill had totaled approximately $30,000.00.  He explained that he did not want to appear in court to testify because he did not remember much of the incident. He had also received many messages on social media about appearing in court.  On cross[-]examination, Sales acknowledged that he had met Nunemaker and [Appellant] prior to this incident but maintained that he did not actually know them.  At first, he did not recall seeing either of them that day but later recalled that he recognized Nunemaker at the gas station when he was down on the ground.

Joleesha Heist testified that Sales had called her on July 16, 2020[,] and told her that he had just been stabbed and that he would need a ride home from the hospital. She picked Sales up at Hershey Medical Center ("HMC") and he told her that he was in pain. When Heist subsequently spoke with Sergeant Uhrich, she told him that Sales had told her he had been stabbed. An audiotape of that conversation was admitted into evidence as Exhibit "20".

Sergeant Duane Koons of the North Lebanon Police Department testified that he was on duty on July 16, 2020[,] and was dispatched to Martin Drive for a call of suspicious activity and to conduct a welfare check on a subject on the ground in the area of Martin Drive and Water Street. When he arrived at the location, Chief Easter was already there. Sergeant Koons observed Sales on the ground. He was bleeding and had a wound on his right lower back above the hip. He told the officers that he had been stabbed at a gas station located at 12th and Cumberland Streets. When they asked him who stabbed him, he told them that it was on the videos.

Sergeant Koons observed that Sales' wound was about an inch to one and [one] quarter inches in length. The wound looked like a slice with very clean edges and was bleeding very quickly. Based on his training, experience, and prior observation of stab wounds, Sergeant Koons explained that it was consistent with a stab wound and looked like it had been inflicted with an edged weapon. On cross-examination, Sergeant Koons explained that Sales was moaning and in pain at the scene. He was slipping in and out of consciousness toward the end of the interaction, but he was able to converse with the police and emergency medical staff.

Officer Justin Stehr of the Pennsylvania Parole Board testified that [Appellant] was on parole in July of 2020[,] and that Officer Stehr was assigned to his supervision. He spoke with [Appellant] via telephone on July 16, 2020[,] at 3:05 p.m. At that time, [Appellant] told him he was eating at Texas Roadhouse. Officer Stehr told [Appellant] he wanted to see him in person at [Appellant]'s home. Officer Stehr went to [Appellant]'s home at 4:32 [p.m.] that afternoon and met with [Appellant]. He described [Appellant]'s demeanor as cool and calm. The next day, Officer Stehr was notified that the Lebanon City Police were looking for [Appellant] in relation to the stabbing and that an arrest warrant would be issued if they could not locate him. Officer Stehr tried to reach [Appellant] by calling on his cellphone

but the cellphone was turned off. He left a voicemail and a text message telling [Appellant] to call him. He was aware that [Appellant] turned himself in three days after the incident. At that time, Officer Stehr had been supervising [Appellant] for about a year and, although there were a few issues with his supervision for which [Appellant] received medium-level sanctions, there had been no major sanctions imposed on him.

Ashley Nunemaker testified that in July of 2020, she was in a romantic relationship with [Appellant]. She also knew Sales as he had been dating her best friend. She was with [Appellant] on the date of this incident as they were intending to go to Autozone on Cumberland Street and then go shopping. They were in her car that day and she was driving with [Appellant] in the front passenger seat. As they were traveling on 12th Street toward Autozone, they decide[d] to stop at the Mobil[] station at the intersection of 12th and Cumberland Streets to get a soda. [Appellant] had been talking on the phone during the ride.

As Nunemaker turned right into the gas station, she was digging in her purse for change. When they entered the parking lot, [Appellant] jumped out of the car while it was still in motion and ran toward Sales who was pumping gas. Nunemaker parked her car in front of the store and got out of the vehicle. At that point, [Appellant] was attacking Sales in the middle of the gas pumps near Sales' car. When Sales ran away, [Appellant] ran after him. She observed Sales fall onto his back on the ground by the red truck with [Appellant] on top of him. Sales asked her to help him and she tried to pull [Appellant] off Sales and tried to put her hands on [Appellant] so he could not strike Sales. However, [Appellant] would not stop and continued the assault.

When [Appellant] stood up, Nunemaker got into her car and began to drive away. As she was exiting the parking lot, [Appellant] jumped into her vehicle. She proceeded on Cumberland Street toward Boscov's, but made [Appellant] get out of the vehicle at 16th and Lehman Streets. She stated that she had no idea that something like this was going to happen that day. When she asked [Appellant] about what happened at the gas station, he had no reaction and did not respond to her questions. She did not notice a knife or weapon in [Appellant]'s hand or anything on the ground. She did notice the severity of Sales' injuries and described his back as being full of blood.

On redirect, Nunemaker explained that Sales' back did not have any blood on it when Sales was running back toward his car from the red truck. After Sales got up after [Appellant] had him pinned on the ground, there was blood on his shirt. Nunemaker acknowledged that she did not see a knife or weapon[,] but stated that she was not looking for one during the incident. The police came to Nunemaker's home the following day looking for [Appellant] and searched her car and her home. She also went to the police department with them to view a photographic lineup and she pointed out [Appellant] as the person who had attacked Sales[] (Exhibit "9")[.]

Alicia Kain, Penn State Health … Information Supervisor, authenticated Sales' medical records from his treatment at HMC[] (Exhibit[s] "22A" and "22B")[.] Dr. Steven Moore, an HMC Emergency Room and Critical Care physician, testified that he was on duty when Sales was brought into the Emergency Room by ambulance and that Sales was immediately labeled a trauma patient. Upon examination, Dr. Moore determined that Sales was in critical condition with very low blood pressure and a single injury that appeared to be a stab wound on his lower right back. Due to the injury, Sales was moved to the operating room for surgery. Dr. Moore described the wound as linear with very clean borders and was consistent with what would be seen with a stab wound. Dr. Moore expressed his opinion that Sales had been stabbed with a reasonable degree of medical certainty.

Dr. Karima Fitzgerald, an HMC trauma surgeon, testified that Sales was transferred to her for surgery from the HMC Emergency Room. She explained that he responded after being given a unit of blood but then became hypotensive (low blood pressure) which indicated possible internal bleeding due to the wound in his back. Upon examination, she determined that the wound involved a laceration to Sales' kidney, that the kidney was bleeding internally, and that he had lost enough blood to become hypotensive.

Dr. Fitzgerald explained that in order to repair the damage to Sales' kidney, she performed a midline laparotomy which involved making an incision across his stomach. She believed the laceration to his back to be 2 to 3 centimeters long. It had clean, even edges: "[I]t didn't look like anything that had been from a blunt object or anything other than a stab." []N.T. [Jury Trial, 5/26/21,] at 197[.] Dr. Fitzgerald's inspection of Sales' shirt strengthened her opinion that this was a stab wound. She also

stated her opinion, with a reasonable degree of medical certainty, that Sales sustained serious bodily injury as the result of a stabbing.

Post-Sentence Motion Opinion ("PSMO"), 1/7/22, at 2-15.

The jury found Appellant guilty on all counts. On August 12, 2021, the trial court sentenced him to 10-20 years' incarceration for aggravated assault pursuant to Section 2702(a)(1),[2] a concurrent term of 1-2 years' incarceration for recklessly endangering another person, and a consecutive term of 1½-5 years' incarceration for possessing instruments of crime, for an aggregate term of incarceration as stated above. Appellant filed a timely post-sentence motion on August 23, 2021, raising sufficiency, weight, and sentencing claims. The trial court ultimately entered an order and opinion denying Appellant's post-sentence motion on January 7, 2022.

Appellant filed a timely notice of appeal on February 4, 2022,[3] and a timely, court-ordered Pa.R.A.P. 1925(b) statement on February 28, 2022. The trial court issued its Rule 1925(a) opinion (dated March 23, 2022) on March 24, 2022. Appellant now presents the following questions for our review:

1. The evidence was insufficient to establish [Appellant]'s guilt on all [c]ounts charged in this case[.]

_____

[2] Appellant's Section 2702(a)(4) violation merged for sentencing purposes with his Section 2702(a)(1) violation.

[3] Appellant mistakenly indicated in his notice of appeal that he was appealing from the order denying his post-sentence motion on January 7, 2022. However, in "a criminal action, appeal properly lies from the judgment of sentence made final by the denial of post-sentence motions." *Commonwealth v. Shamberger*, 788 A.2d 408, 410 (Pa. Super. 2001) (*en banc*). We have corrected the caption accordingly.

2. The verdict with respect to all [c]ounts was against the weight of evidence as it relied on circumstantial evidence alone.

3. The [trial c]ourt erred when it allowed [Chief Easter] to testify to the statements made by the alleged victim over [d]efense [c]ounsel's hearsay objection on the basis that the statement was an excited utterance.

4. The [trial c]ourt erred when it allowed the Commonwealth to play a video of the incident without proper authentication as to the authenticity and accuracy of the images being depicted in said video.

5. The [trial c]ourt erred when it allowed the Commonwealth to introduce evidence of the amount of money that the victim owed in medical bills to establish whether the injury qualified as "[s]erious bodily injury[.]"

6. The [trial c]ourt erred when it denied [Appellant]'s post[-]sentence motion without a hearing in which it was argued that [Appellant]'s [p]rior [r]ecord [s]core was improperly calculated as the two prior convictions used to substantiate this score were out of state convictions and the evidence of these convictions was never properly entered into evidence or authenticated; thus, resulting [in] him receiving an illegal sentence in this case.

7. The [trial c]ourt erred when it denied [Appellant]'s motion *in limine* requesting that the Commonwealth's two officers be prohibited from testifying regarding whether the victim's wound was a " stab" wound caused by a knife or some other object when they were not qualified as experts to present such testimony.

Appellant's Brief at 16-17.

**I.**

In Appellant's first claim, he asserts that there was insufficient evidence to support the offenses for which he was convicted.[4, 5] Specifically, Appellant asserts that "the Commonwealth failed to show that Appellant ever possessed a weapon[,]" as "no witness ever saw a weapon in Appellant's possession." Appellant's Brief at 42.

---

[4] Appellant's statement of this issue mirrors the statement of the same issue in his Rule 1925(b) statement. As such, it appears fatally vague on its face, as it fails to identify which elements of which offenses lacked sufficient evidence. *See Commonwealth v. Gibbs*, 981 A.2d 274, 281 (Pa. Super. 2009) (holding that Gibbs waived his sufficiency challenge where he "not only failed to specify which elements he was challenging in his 1925[(b)] statement," but "also failed to specify which convictions he was challenging"). However, we overlook this deficiency and decline to find waiver in the narrow circumstances of this case, as the only fact contested at Appellant's trial concerned his possession and use of a knife or similar weapon to commit the assault on the victim. Moreover, in the argument section of his brief, Appellant specifies which elements of which offenses that the Commonwealth ostensibly failed to prove with sufficient evidence. As such, Appellant's failure to provide more specificity regarding the nature of his sufficiency claim did not impede the trial court's review of his claim, nor does it hinder our own review for the same reason. Nevertheless, we chastise appellate counsel for risking waiver of this issue by failing to adhere to basic appellate rules. *See* Pa.R.A.P. 1925(b)(4)(ii) ("The Statement *shall concisely identify* each error that the appellant intends to assert with sufficient detail to identify the issue to be raised for the judge.") (emphasis added); *and see* Pa.R.A.P. 1925(b)(4)(vii) ("Issues not included in the Statement and/or not raised in accordance with the provisions of this paragraph (b)(4) are waived.").

[5] Despite claiming in his statement of the issues that he was challenging the sufficiency of the evidence with respect to all the charges for which he was convicted, Appellant effectively abandons any such claim with respect to his conviction for recklessly endangering another person. *See* Appellant's Brief at 40 ("The evidence was insufficient to establish Appellant's guilt on count 1, 2[,] and 4 of the information.") (emphasis and capitalization omitted). Appellant further provides no argument supporting a challenging to the sufficiency of the evidence for that offense.

For sufficiency-of-the-evidence claims, our standard of review is whether,

> viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Edwards*, 229 A.3d 298, 305–06 (Pa. Super. 2020) (cleaned up), *aff'd*, 256 A.3d 1130 (Pa. 2021).

Appellant contends that the Commonwealth's ostensible failure to prove his possession of a knife (or similar weapon) was a fatal defect with respect to his conviction at Count 4, possessing instruments of crime, as his possession of a weapon is the *sine qua non* of that offense. **See** Appellant's Brief at 42. He also argues that "the evidence … falls short with respect to both" counts of aggravated assault, because "these offenses require the Commonwealth to demonstrate that Appellant had the means to cause such an injury and that he had the requisite intent to commit this injury." **Id.** Appellant further maintains that

- 12 -

[t]he Commonwealth attempt[ed] to carry their burden on this element by showing that Appellant punched the victim in the area where the injury occurred. However, the video does not show that he possessed a knife at the time he made contact with the victim. Further, no object matching the description of a knife was found at the scene nor in Appellant's possession. Thus, the Commonwealth merely surmises that [he] had a knife at the time that he made contact with the victim, but there is no actual evidence to support this conclusion.

*Id.* at 42-43.

The trial court deemed Appellant's first claim meritless, reasoning as

follows:

[Appellant] contends that the Commonwealth's evidence was insufficient to support the jury's verdict on Aggravated Assault (both Counts 1 and 2) and Possessing Instruments of Crime (Count 4). To sustain a conviction under Count 1, the Commonwealth [had to] prove that [Appellant] "attempted to cause serious bodily injury to another, or caused such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of is human life." 18 Pa.C.S.[] § 2702(a)(1). For Count 2, the Commonwealth was required to prove that [Appellant] "attempted to cause or intentionally or knowingly caused bodily injury to another with a deadly weapon." 18 Pa.C.S.[] § 2702(a)(4). Count 4 required proof that [Appellant] possessed any instrument of crime with intent to employ it criminally. 18 Pa.C.S.[] § 907(a). [Appellant]'s argument focuses on his claim that there was insufficient proof that he possessed a weapon at the time of this incident.

The evidence provided by the medical and law enforcement witnesses, as well as the physical evidence and Sales' reports to the police, emergency workers, and Heist provided overwhelming circumstantial evidence that [Appellant] possessed and used a knife during his assault on Sales and that Sales sustained serious bodily injuries as a result. On the surveillance video, [Appellant] could be seen holding his hand in his pocket, then looking as if he was holding something in his hand, making a stabbing motion into Sales' back where his wound appeared, and then placing his balled[-]up hand back into his pocket. Blood appeared on Sales' back only after [Appellant] had made this stabbing-motion. Sales

- 13 -

called Joleesha Heist shortly after the incident and told her he had just been stabbed. He repeatedly reported that he had been stabbed to the police and emergency workers who were attending to him when he was found on Martin Drive. Chief Easter and Sergeant Koons testified that the wound was clean and thin and was consistent with a stab wound inflicted with a knife or edged-weapon. The shirt found by Sergeant Uhrich at the scene showed a clean linear slit which was consistent with a knife cut in the area of Sales' wound. Both physicians who treated Sales at HMC opined, with a reasonable degree of medical certainty, that the wound had been caused by stabbing with a knife or similar object.

There was no evidence of any other object at the scene that could have caused Sales' injuries. Sergeant Uhrich explained that perpetrators usually take their weapons with them after an attack. On the video, [Appellant] could be seen keeping his hand in his pocket, removing it and making the stabbing motion, then replacing his hand after reaching for something after the attack. Despite the fact that no witness actually testified that they saw [Appellant] with a knife, we believe this evidence was sufficient to sustain the jury's finding [that Appellant] possessed a weapon [and] used it to stab Sales[.]

PSMO at 18-20.

We agree with the trial court's thorough analysis. There was ample circumstantial evidence in this case supporting the inference that Appellant attacked Sales with a knife (or a similar weapon[6]). Appellant's first claim is meritless.

## II.

---

[6] Appellant also argues that "there was evidence presented from the Commonwealth's witnesses suggesting that [Sales'] injury could have been inflicted by a sharp object other than a knife." Appellant's Brief at 43. This is a distinction without a difference in the factual circumstances of this case. With respect to the offenses for which Appellant was convicted, it matters not whether Appellant specifically used a knife or another sharp object in inflicting the wound on Sales, where there was overwhelming circumstantial evidence that Appellant wielded that object when he attacked Sales.

Next, Appellant claims that the jury's verdict was against the weight of the evidence with respect to Counts 1, 2, and 4, echoing many of the same arguments he presented in his sufficiency claim. He notes that neither Sales nor Nunemaker testified to having observed a weapon, despite being the only eyewitnesses to the attack, and that the police never recovered a weapon "that could have been used to cause this injury." Appellant's Brief at 46. He argues that "it is just as likely that the victim was injured in some other way other than what the Commonwealth alleges[,]" speculating that, because "it was clear that the victim fell a couple of times during this assault[,]" Sales "could have landed on a sharp object that would have injured him in this way." *Id.* He contends that the location of the assault – a gas station – was a place where such objects were "likely to be lying around." *Id.* at 47.

> The following principles are applicable to a challenge to the weight of the evidence:
>
> > "A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court." ***Commonwealth v. Widmer***, … 744 A.2d 745, 751–52 ([Pa.] 2000); ***Commonwealth v. Brown***, … 648 A.2d 1177, 1189 ([Pa.] 1994). A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. ***Widmer***, … 744 A.2d at 752. Rather, "the role of the trial judge is to determine that 'notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.'" ***Id.*** [] (citation omitted). It has often been stated that "a new trial should be awarded when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given

another opportunity to prevail." **Brown**, … 648 A.2d at 1189.

**Commonwealth v. Clay**, … 64 A.3d 1049, 1054–55 ([Pa.] 2013).

In other words, "[a] weight of the evidence claim concedes that the evidence is sufficient to sustain the verdict, but seeks a new trial on the ground that the evidence was so one-sided or so weighted in favor of acquittal that a guilty verdict shocks one's sense of justice." **Commonwealth v. Lyons**, … 79 A.3d 1053, 1067 ([Pa.] 2013).

> This Court's standard of review in evaluating a trial court's ruling on a weight of the evidence claim is different than the standard of review applied by the trial court:
>
> > Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. **Brown**, 648 A.2d at 1189. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. **Commonwealth v. Farquharson**, … 354 A.2d 545 (Pa. 1976). One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.
>
> **Widmer**, … 744 A.2d at 753[].
>
> This does not mean that the exercise of discretion by the trial court in granting or denying a motion for a new trial based on a challenge to the weight of the evidence is unfettered. In describing the limits of a trial court's discretion, we have explained:
>
> > The term "discretion" imports the exercise of judgment, wisdom and skill so as to reach a dispassionate conclusion within the framework of the law, and is not exercised for the purpose of giving effect to the will of the judge. Discretion must be

- 16 -

> exercised on the foundation of reason, as opposed to prejudice, personal motivations, caprice or arbitrary actions. Discretion is abused where the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill-will.

> **Widmer**, … 744 A.2d at 753 (quoting **Coker v. S.M. Flickinger Co.**, … 625 A.2d 1181, 1184–85 ([Pa.] 1993)).

**Clay**, 64 A.3d at 1055.

Further, our Supreme Court has clarified that[,]

> [t]o determine whether a trial court's decision constituted a palpable abuse of discretion, an appellate court must "examine the record and assess the weight of the evidence; not however, as the trial judge, to determine whether the preponderance of the evidence opposes the verdict, but rather to determine whether the court below in so finding plainly exceeded the limits of judicial discretion and invaded the exclusive domain of the jury." Where the record adequately supports the trial court, the trial court has acted within the limits of its judicial discretion.

> **Id.** at 1056 (quoting **Brown**, 648 A.2d at 1190 (citation omitted)) [].

**Commonwealth v. Landis**, 277 A.3d 1172, 1183–84 (Pa. Super. 2022), *reargument denied* (Aug. 1, 2022).

The trial court determined that the verdict was not against the weight of the evidence, indicating instead that the jury had "ample evidence that [Appellant] was in possession of a weapon and that he used that weapon to cause Sales' injuries." PSMO at 22. The court further stated that the "jury obviously found the Commonwealth's witnesses to be credible and we find no conflicting evidence of such great weight which would overshadow that

- 17 -

finding." **Id.** We ascertain no abuse of discretion by the trial court in its rejection of Appellant's weight-of-the-evidence claim. Appellant merely speculates as to alternative possible causes of Sales' wound, theories which the jury was free to reject in light of the other evidence in this case that clearly supports the inference that Sales' wound was caused by Appellant's use of a weapon. Thus, Appellant's second claim lacks merit.

## **III.**

Next, Appellant argues that the trial court erred in overruling his hearsay objection during Chief Easter's testimony. Specifically, Chief Easter testified that, when he first encountered Sales and saw that he was bleeding, he asked Sales what had happened to him. N.T., 5/26/21, at 8. Defense counsel objected on hearsay grounds. **Id.** The Commonwealth argued that Sales' statement to Chief Easter was admissible under the excited utterance exception to the hearsay rule. **Id.** The trial court overruled the objection on that basis, and Chief Easter then testified that Sales told him "that he was gassing up at the Mobil[] station at 12th and Cumberland when an individual approached him and stabbed him." **Id.** Chief Easter then "asked him if he knew this person, and he said he never saw him in his life." **Id.**

"The admissibility of evidence is solely within the discretion of the trial court and will be reversed only if the trial court has abused its discretion." **Commonwealth v. Cunningham**, 805 A.2d 566, 572 (Pa. Super. 2002). "Hearsay is defined as 'a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth

of the matter asserted.'" *Id* (quoting Pa.R.E. 801(c)).  Hearsay testimony is inadmissible in this Commonwealth, except as provided in the Pennsylvania Rules of Evidence or "by other rules prescribed by the Pennsylvania Supreme Court, or by statute."  Pa.R.E. 802.

Pennsylvania's evidentiary rules provide an exception to the rule against hearsay for excited utterances, which are statements "relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused."  Pa.R.E. 803(2).  Under Rule Rule 803(2), "[w]hen the declarant is unidentified, the proponent" of the exception "shall show by independent corroborating evidence that the declarant actually perceived the event or condition."  *Id.*  The Comment to Rule 803(2) provides further guidance for the application of the exception as follows:

> This rule differs from F.R.E. 803(2) insofar as it requires independent corroborating evidence when the declarant is unidentified.  *See Commonwealth v. Upshur*, 764 A.2d 69 (Pa. Super. 2000).
>
> This exception has a more narrow base than the exception for a present sense impression, because it requires an event or condition that is startling.  However, it is broader in scope because an excited utterance (1) need not describe or explain the startling event or condition; it need only relate to it, and (2) need not be made contemporaneously with, or immediately after, the startling event.  It is sufficient if the stress of excitement created by the startling event or condition persists as a substantial factor in provoking the utterance.
>
> There is no set time interval following a startling event or condition after which an utterance relating to it will be ineligible for exception to the hearsay rule as an excited utterance. In *Commonwealth v. Gore*, 396 A.2d 1302, 1305 (Pa. Super. 1978), the [C]ourt explained:

> The declaration need not be strictly contemporaneous with the existing cause, nor is there a definite and fixed time limit. … Rather, each case must be judged on its own facts, and a lapse of time of several hours has not negated the characterization of a statement as an "excited utterance." … The crucial question, regardless of the time lapse, is whether, at the time the statement is made, the nervous excitement continues to dominate while the reflective processes remain in abeyance.

Pa.R.E. 803(2) (comment).

The trial court admitted Sales' statement to Chief Easter under the excited utterance exception to the rule against hearsay because:

> Sales made the statement to Chief Easter within a very short time after he had experienced a startling event — an unprovoked attack and stabbing. It is apparent that he was still under the stress of that excitement when the statements were made as he was l[]ying on the grass bleeding from his injuries. Sales' demeanor, as well as his scrapes, wounds, and bloody appearance indicated that he had just been involved in this startling event and that his statements were a spontaneous, rather than a reflective, reaction to being attacked and stabbed.

Trial Court's Rule 1925(a) Opinion ("TCO"), 3/23/22, at 5.

In arguing that the excited utterance exception did not apply to Sales' statement to Chief Easter, Appellant first contends that

> Sales['] own testimony was that he does not remember what happened to him at the time of the incident. He repeatedly stated this during his testimony. He would simply refer all questions to the video of the incident. Thus, by his own admission, he did not have any recollection of the incident and there is no evidence to suggest that he witnessed the incident.

Appellant's Brief at 50.

Here, Appellant confusingly appears to be claiming that Sales did not witness the attack in which **he was the victim**, due to Sales' memory issues

about the incident at the time of trial. This claim is simply belied by the record, which included video evidence which indisputably showed Sales' being assaulted by Appellant. Nevertheless, even if Appellant is more narrowly contending that Sales did not witness the specific 'stabbing' act, his argument is still meritless. "[I]ndependent corroborating evidence that the declarant actually perceived the event or condition" giving rise to the excited utterance exception to the rule against hearsay is only required when "the declarant is unidentified…." Rule 803(2). Here, the declarant, Sales, is clearly "identified" within the meaning of the rule. Thus, the Commonwealth was not required to show independent evidence that Sales had witnessed his own stabbing beyond the information provided within the contested statement. Nevertheless, the video evidence clearly corroborated that Sales had the opportunity to witness the alleged stabbing.

Appellant cites to **Commonwealth v. Pronkoskie**, 383 A.2d 858 (Pa. 1978), but we find that case distinguishable. In **Pronkoskie**, the defendant was accused of murdering his wife. The Commonwealth sought to admit hearsay statements made by the couple's three-year-old daughter, Tina, which included, *inter alia*, the statement: "Daddy shot mommy." **Id.** at 859. The **Pronkoskie** Court ultimately deemed her statements inadmissible under the excited utterance exception, because:

> While the Commonwealth has established Tina's presence in the trailer at the time of the shooting, there is nothing to indicate that Tina actually saw what occurred. Indeed, her responses during the competency examination contain repeated indications that she did not actually see the shooting. While generally[,] the

- 21 -

proponent of the evidence need only establish that a declarant was in a position to view an incident, … the present record raises serious enough doubts concerning Tina's presence at the event that a verdict based upon her statements would border upon speculation or conjecture.

*Id.* at 861–62 (footnotes omitted).

Appellant ostensibly attempts to analogize Sales' memory issues at trial to Tina's statements at her competency hearing indicating that she had not witnessed the shooting. In ***Pronkoskie***, however, Tina was not the victim of the shooting, and there was no evidence that she had actually witnessed it. Moreover, the "more incriminatory utterances by Tina were those made … remote in time[,]" that is, much longer than an hour after the shooting and, due to her young age, the Court found it "not unlikely that Tina's imagination might have distorted her perception of the incident." ***Id.*** at 863. Additionally, the ostensibly excited nature of Tina's "utterance [was] belied by the calm and unemotional manner in which [it was] made." ***Id.***

Here, by contrast, the video evidence clearly established that Sales was in a position to witness the assault of which he was the victim. The video timestamp on the gas station security cameras indicated that it was approximately 12:15 p.m. when the assault began. ***See*** N.T., 5/26/21, at 33. Sales then drove away from the gas station but was found soon thereafter by Chief Easter in the front lawn of a home in North Lebanon Township, still bleeding from his wound. While Chief Easter did not testify as to the exact time when he found Sales, we can glean from the record that it was no later

than 12:40 p.m.[7] When Chief Easter came upon Sales, Sales was still bleeding from his wound, and lying in the grass, having exited his car. *Id.* at 7. Appellant claims that Sales was "clearly quite deliberative and thoughtful at the time[,]" but, that conclusion is not supported by the record. Although Chief Easter did not describe Sales' demeanor, Sergeant Koons testified that Sales was "moaning" in obvious pain while being questioned by Chief Easter, and that he appeared to be "slipping in and out" of consciousness toward the end of their interaction. *Id.* at 137. Based on these facts, we ascertain no abuse of discretion by the trial court in its determination that Sales' statement was made soon after the startling event (the assault), and that he was still under the excitement of that event because he was lying in the grass, bleeding from his injuries and moaning in pain, and eventually he was slipping in and out of consciousness while Chief Easter spoke with him. *See* TCO at 5. Thus, we conclude that Appellant's third claim is also meritless.

## IV.

Next, Appellant argues that the trial court erred by admitting the security videos from the Mobil gas station over his objection. He asserts that the video evidence was not properly authenticated because "the Commonwealth did not have anyone associated with the Mobil[] gas station

---

[7] Sergeant Uhrich responded to the gas station at 12:40 p.m., after learning from North Lebanon Township police that a stabbing had occurred there. That information was obtained from Sales. *See* N.T., 5/26/21, at 20-21. Thus, at most, 25 minutes had elapsed from the time of the stabbing until Sales made the statement to Chief Easter.

or anyone who was familiar with the video system available to testify about the operability or the authenticity of the video itself." Appellant's Brief at 52. He also claims that "no eyewitnesses testified regarding the accuracy of the video and what it depicted." *Id.* at 52-53.

> Pursuant to Pennsylvania Rule of Evidence 901, authentication is required prior to admission of evidence. The proponent of the evidence must introduce sufficient evidence that the matter is what it purports to be. *See* Pa.R.E. 901(a). Testimony of a witness with personal knowledge that a matter is what it is claimed to be can be sufficient. *See* Pa.R.E. 901(b)(1). Evidence that cannot be authenticated by a knowledgeable person, pursuant to subsection (b)(1), may be authenticated by other parts of subsection (b), including circumstantial evidence pursuant to subsection (b)(4).[6] *See* Pa.R.E. 901(b)(4).
>
> > [6] Pursuant to Rule 901(b)(4), evidence may be authenticated by "Distinctive Characteristics and the Like. The appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances." Pa.R.E. 901(b)(4).

*Commonwealth v. Mangel*, 181 A.3d 1154, 1158–59 (Pa. Super. 2018).

Here, the trial court determined that the following testimony authenticated the video evidence:

> At trial, Sergeant Keith Uhrich of the Lebanon City Police Department testified that he personally viewed and retrieved the video from the Mobil[ gas s]tation shortly after the report of the attacked was received by Lebanon City Police. Sergeant Uhrich confirmed the accuracy of the timestamp, as the video indicated that it was created and copied on the date of this incident, July 16, 2020. He confirmed that the video was an accurate depiction of the Mobil[ gas s]tation on that date. He was also able to confirm that Sales appeared in the video. []N.T.[,] 5/26/21[,] at 35.
>
> During the trial, Sergeant Duane Koons of the North Lebanon Police Department testified that he also responded to the dispatch to the location where Sales was reported to be l[]ying on the

ground after he fled the Mobil[ gas s]tation. [*Id.*] at 133[.] At that time, Sales told him he had been stabbed at the Mobil[ gas s]tation and that the incident had been recorded on the [s]tation's video cameras. [*Id.*] at 134-135[.] In addition, Sales would testify at the trial that it was him in the video. [*Id.*] at 101, 104[.] [Appellant] also placed himself at the Mobil[ gas s]tation during his interview with Sergeant Uhrich. [*Id.*] at 72[.]

TCO at 6-7.

The trial court determined that Appellant's authentication objection at trial — that "Sergeant Uhrich was not present at the time of the incident and could not testify that the video depicted any of his personal observations[,]" and that "the Commonwealth had not presented any witness who could verify that the camera system was working properly on that date and the accuracy of the timestamp" — were matters that "went to the weight, rather than the admissibility, of this evidence[.]" *Id.* at 7.

The Commonwealth further argues:

First, the footage was authenticated by a witness with knowledge- - the victim, Jarrod Sales. *See* Pa.R.E. 901(b)(1). While Sales, who had been threatened not to testify, was reluctant to do so, he nonetheless identified himself on the video and agreed that the video showed what happened that day. []N.T.[, 5/26/21], at 100-02.

Second, the testimony of Sgt. Uhrich overwhelmingly supported the premise that the video footage was "what it was claimed to be" under Pa.R.E. 901(b)(4) and (9). Sgt. Uhrich went to the crime scene shortly after the attack on July 16, 2020[,] to investigate the assault. As part of his investigation, he personally retrieved and viewed all recorded camera angles depicting the incident from the Mobil [gas station]'s surveillance cameras. []N.T.[, 5/26/21], at 26-27[]. Sgt. Uhrich's personal observations of the physical crime scene at that time were accurately depicted by and consistent with the video footage. [*Id.*] at 28[]. The date stamp displayed on the footage showed the correct date, July 16, 2020. [*Id.*] at 27[]. The timestamp displayed on the footage

- 25 -

displayed the correct time. [*Id.*] at 27[]. That same date, he made the copies of the footage ultimately shown to the jury, copies he had since reviewed more than 50 times. [*Id.*] at 36[].

Moreover, Sgt. Uhrich was able to authenticate the footage by circumstantial evidence as specifically permitted by subsection (b)(4): "[t]he appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances." He was able to identify people and objects in the video content that confirmed the connection of the footage with the assault at issue. Sgt. Uhrich was able to identify the victim at various times during the video, including a close-up of Sales'[] face when he fled inside the Mobil [gas station] for safety. []N.T.[, 5/26/21] at 27-28, 35[]. Sgt. Uhrich was able to identify the car of Ashley Nunemacher, [in] which [Appellant] both arrived to and fled from the scene. [*Id.*] at 31-32[]. Sgt. Uhrich was able to identify the victim's vehicle and the distinct characteristics of the crime scene itself on the day of the incident, including a missing gas pump where part of the assault occurred. [*Id.*] at 28, 31[]. He was able to reconcile the trail of blood and bloody shirt of the victim as he saw them on the video with what he discovered during his physical search and investigation of the crime scene. [*Id.*] at 40-41, 50, 55-56[]. Thus, distinct contents and overall substance of the footage further established that the video evidence was what it was claimed to be: video evidence of the assault perpetrated by … Appellant.

Commonwealth's Brief at 57-59.

We agree with the Commonwealth's thorough analysis. There was ample circumstantial evidence presented to verify the authenticity of the security video evidence presented at Appellant's trial. The video was retrieved by police soon after the incident, it showed an accurate timestamp, the victim identified himself from the video footage,[8] and Sgt. Uhrich provided a substantial amount of testimony supporting the conclusion that the video

---

[8] Thus, Appellant's contention that no eyewitnesses were offered to authenticate the video is simply belied by the record.

accurately depicted the location of the assault that had occurred immediately prior to when the police secured the video, by comparing his personal observations of the scene to what was depicted in the video. Moreover, we also agree with the Commonwealth that there is no absolute requirement under Rule 901 that accuracy of the video be established "by the business representative or building owner where the cameras are installed." Commonwealth's Brief at 60.[9] Accordingly, we ascertain no abuse of discretion by the trial court in its overruling Appellant's objection to the authentication of the video evidence.

## V.

Next, Appellant argues that the trial court erred in permitting the Commonwealth to introduce Sales' medical bills as evidence of the seriousness of his injury. Appellant claims that the medical bills were not relevant to prove serious bodily injury,[10] and that the admission of that evidence misled the jury

---

[9] Appellant cites to two, non-precedential decisions by this Court, both of which involved challenges to the authenticity of a video that were ultimately rejected. *See* Appellant's Brief at 53-55. However, only unpublished memorandum decisions filed after May 1, 2019, may be cited for their persuasive value. *See* Superior Court I.O.P. 65.37(B). Thus, we decline to address Appellant's analysis of those cases in relation to this matter, as both of those memorandums were filed before the requisite date.

[10] To prove Appellant committed aggravated assault under subsection (a)(1), the Commonwealth was required to demonstrate that he attempted "to cause serious bodily injury to another, or cause[d] such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life…." 18 Pa.C.S. § 2702(a)(1).

to the extent that it was "clearly prejudicial and deprived Appellant of a fair trial in this case." Appellant's Brief at 60.

We note that: "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Pa.R.E. 401. Furthermore, "[a]ll relevant evidence is admissible, except as otherwise provided by law. Evidence that is not relevant is not admissible." Pa.R.E. 402. The trial court "may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Pa.R.E. 403.

As explained by the trial court,

Sales testified that his injuries required surgery to his stomach, that he was in the hospital for seven days following this incident, and that he had unpaid medical bills of approximately $30,000. []N.T.[,] 5/26/21[,] at 107-[]08[.] The amount of the medical expenses and the bills he incurred for the treatment of his injuries is reflective of the extent and degree of medical care and attention which were necessary and which were provided to him as the result of the injuries inflicted during the attack. This evidence was relevant and probative as to whether he sustained "serious bodily injury" for purposes of the offense of aggravated assault charged in Count 1 of the information.

TCO at 8.

We agree with the trial court. Sales' $30,000 medical bill was circumstantial evidence that tended to make it more likely that he had suffered serious bodily injury than had he incurred lesser expenses, or no cost at all,

- 28 -

for the treatment of his wound. Appellant's bald argument that such evidence is not at all relevant to establish serious bodily injury is unsupported by any caselaw, and simply contrary to common sense. Furthermore, to the extent that Appellant is merely arguing that the jury was misled or confused by the cost of his medical expenses despite its relevance,[11] the record belies that assertion, as Sales also testified that his injury required surgery and a seven-day stay in the hospital. In light of that other evidence establishing the extent of his injuries, we disagree that that jury was misled or confused by the cost of his medical care. Appellant did not incur such significant medical expenses despite otherwise minimal medical intervention to treat his stab wound. Rather, the cost of his medical care was proportionate and/or reflective of the seriousness and extent of his treatment, given that the wound required surgery and a week-long stay in the hospital. Accordingly, we conclude that Appellant's fifth claim lacks merit.

## VI.

In his penultimate claim, Appellant asserts that his Prior Record Score ("PRS") was incorrectly calculated as a repeat felon ("RFEL"), based on his out-of-state convictions from New York. There is no dispute in this appeal as to whether Appellant was properly classified as an RFEL *if* his New York

---

[11] *See* Rule 403.

convictions are treated separately for purposes of calculating his PRS.[12]

However, Appellant argues that, because his sentences for his New York convictions were ordered to run concurrently, only the most serious of those offenses should have been used to calculate his PRS.

We address Appellant's sentencing claim under the following standards:

Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

*Commonwealth v. Hoch*, 936 A.2d 515, 517–18 (Pa. Super. 2007) (citation omitted). However,

[c]hallenges to the discretionary aspects of sentencing do not entitle an appellant to review as of right. *Commonwealth v. Sierra*, 752 A.2d 910, 912 (Pa. Super. 2000). An appellant challenging the discretionary aspects of his sentence must invoke this Court's jurisdiction by satisfying a four-part test:

[W]e conduct a four-part analysis to determine: (1) whether [the] appellant has filed a timely notice of appeal, *see* Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, *see* Pa.R.Crim.P. [720]; (3) whether [the] appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence

---

[12] The Commonwealth opines that Appellant's PRS may have been understated. *See* Commonwealth's Brief at 74-75. However, the Commonwealth did not file an appeal to contest the discretionary aspects of Appellant's sentence. Thus, for purposes of this appeal, we consider only whether Appellant's PRS assignment was too high based on his out-of-state convictions.

appealed from is not appropriate under the Sentencing Code, 42 Pa.C.S.[] § 9781(b).

*Commonwealth v. Evans*, 901 A.2d 528, 533 (Pa. Super. 2006) … (internal citations omitted). Objections to the discretionary aspects of a sentence are generally waived if they are not raised at the sentencing hearing or in a motion to modify the sentence imposed. *Commonwealth v. Mann*, 820 A.2d 788, 794 (Pa. Super. 2003)….

The determination of what constitutes a substantial question must be evaluated on a case-by-case basis. *Commonwealth v. Paul*, 925 A.2d 825, 828 (Pa. Super. 2007). A substantial question exists "only when the appellant advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing process." *Sierra*, *supra* at 912-13.

As to what constitutes a substantial question, this Court does not accept bald assertions of sentencing errors. *Commonwealth v. Malovich*, 903 A.2d 1247, 1252 (Pa. Super. 2006). An appellant must articulate the reasons the sentencing court's actions violated the sentencing code. *Id.*

*Commonwealth v. Moury*, 992 A.2d 162, 170 (Pa. Super. 2010).

Here, there is no dispute that Appellant filed a timely notice of appeal. Furthermore, Appellant provides a Rule 2119(f) statement in his brief. Appellant's Brief at 61-63. Additionally, a "claim that the sentencing court misapplied the Sentencing Guidelines" with respect to the calculation of a PRS "presents a substantial question." *Commonwealth v. Johnson*, 758 A.2d 1214, 1216 (Pa. Super. 2000). However, the Commonwealth disputes whether Appellant properly preserved his claim for our review.

The Commonwealth acknowledges that, in his post-sentence motion, Appellant "challenged the methodology by which his [PRS]—and therefore [his] RFEL classification—was calculated." Commonwealth's Brief at 65.

However, the Commonwealth maintains that "Appellant did not in any way …

challenge the authenticity of his New York convictions or the accuracy of the

sentences received on those convictions." *Id.*   Nevertheless, in his Rule

1925(b) statement, Appellant presented his claim as follows:

> The [trial c]ourt erred when it denied [Appellant]'s post sentence motion without a hearing in which it was argued that [Appellant]'s [PRS] was improperly calculated as the two prior convictions used to substantiate this score were out[-]of[-]state convictions and the evidence of these convictions was never properly entered into evidence or authenticated; thus, resulting [in] him receiving an illegal sentence in this case.

Appellant's Rule 1925(b) Concise Statement, 2/28/22, at 1 ¶ 6.

After reviewing the record, we agree with the Commonwealth that

Appellant failed to preserve a claim that that his out-of-state convictions were

not properly entered into evidence or authenticated.  Nevertheless, any such

claim was effectively abandoned in Appellant's brief, as he presents no

argument therein regarding the admission or authenticity of his out-of-state

convictions.   To the contrary, Appellant argues in his brief under the

assumption that the record accurately represents the relevant facts regarding

those New York convictions.  *See* Appellant's Brief at 66 (concluding that, "if

we are to assume the accuracy of the New York sentencing documents, then

it is clear that Appellant's New York convictions were served concurrently.  As

a result, the [t]rial [c]ourt erred when it sentenced him as if he was an RFEL").

As to Appellant's claim that his PRS was improperly calculated, we deem that

issue adequately preserved in Appellant's Rule 1925(b) statement.[13] Thus, with regard to that narrow issue, we conclude that Appellant has satisfied the requirements to invoke our jurisdiction to review his discretionary-aspects-of-sentencing claim. Thus, we turn to address that claim on its merits.

As background, it is now undisputed that, at the time of sentencing in this case, Appellant had two prior, out-of-state convictions in New York. First, Appellant pled guilty in New York to 2nd degree Burglary on September 12, 2006, and was sentenced for that offense on February 7, 2007, to 5 years' imprisonment. Second, he pled guilty in New York to 1st Degree Manslaughter on September 28, 2008, and was sentenced for that offense on November 7, 2008, to 14 years' imprisonment, to be served concurrently to his February 7, 2007 sentence for burglary.

_____

[13] The Commonwealth narrowly interprets Appellant's Rule 1925(b) statement as having abandoned the improper-calculation argument based upon the concurrent nature of the out-of-state sentences, due to Appellant's inclusion of the additional language challenging the authentication of those out-of-state convictions. Although Appellant could have been clearer, we believe that his statement of the issue in the Rule 1925(b) statement was an attempt to preserve both claims, particularly since Appellant challenged the court's denial of his post-sentence motion (wherein the Commonwealth claims that no authentication claim had been raised). While the trial court did not directly address the improper-calculation claim in its Rule 1925(a) opinion, that was not surprising because it had already addressed that specific claim in its opinion denying Appellant's post-sentence motion. *See* PSMO at 22-25. The trial court further stated that it only intended to address claims in its Rule 1925(a) opinion that it had not previously addressed in the post-sentence motion opinion, *see* TCO at 2, and the court made no comment as to whether it believed Appellant had abandoned the improper-calculation claim. In these circumstances, we conclude that Appellant did not abandon his improper-calculation claim in his Rule 1925(b) statement.

Appellant argues that because his sentences were set to run concurrently, Pennsylvania's Sentencing Guidelines[14] dictate, or are at least ambiguous, as to whether his New York "convictions should be aggregated, which would make Appellant an[] RFEL, or if they should be combined, which would reduce his PRS to a 4." Appellant's Brief at 64. Appellant points to Section 303.5 of the Sentencing Guidelines, which provides as follows:

> (a) If there is a single offense in the prior judicial proceeding, that offense shall be counted in the calculation of the Prior Record Score.
>
> (b) If there are multiple offenses in the prior judicial proceeding:
>
>> (1) The most serious offense of the judicial proceeding shall be counted in the calculation of the Prior Record Score.
>>
>> (2) Any offense for which a sentence of supervision or confinement is imposed consecutive to a sentence for another offense in the judicial proceeding shall be counted in the calculation of the Prior Record Score.

204 Pa. Code § 303.5.

Appellant maintains that, although "Section 303.5 specifically states that any sentence that is run consecutively shall be counted in the calculation of the [PRS,] … it is silent with respect to cases that are run concurrently." Appellant's Brief at 65. Appellant then turns to a prior version of Section 303.5 to argue as follows:

> Prior to 2005, the guidelines specifically required that sentences must be "totally concurrent" in order to not be counted towards a defendant's [PRS]. In 2005[,] this language was removed to read as it does in the current version of [Section] 303.5. Given the removal of this language, it is clear that the requirement for "total

_____

[14] *See* 204 Pa. Code § 301.1 *et seq*.

concurrency" was dropped from the legislation. Instead, the current law only counts sentences that are run consecutively to one another in the determination of a defendant's prior record score.

*Id.* at 66.

The trial court disagreed, reasoning instead that, because Appellant's "sentences were imposed at two separate sentencing proceedings, both offenses were properly utilized in the calculation of his PRS[,]" despite the fact that the second sentence had been ordered to run currently to the first. PSMO at 24.

The Commonwealth agrees with the trial court, arguing that Appellant's

stated analysis is not accurate, as demonstrated by a review of the actual language of [Section] 303.5, read in conjunction with other sections— particularly the definitions section— promulgated by the Sentencing Commission. Section 303.5 states:

[](a) If there is a single offense in the prior judicial proceeding, that offense shall be counted in the calculation of the Prior Record Score.

(b) If there are multiple offenses in the prior ***judicial proceeding***:

(1) The most serious offense of the judicial proceeding shall be counted in the calculation of the Prior Record Score.

[204 Pa. Code § 303.5] (emphasis added).

The term "judicial proceeding" is defined by the Sentencing Commission in § 303.2. That section states, in pertinent part:

(b) Judicial proceeding. A judicial proceeding is a proceeding in which all offenses for which the offender has been convicted are pending before the court ***for sentencing at the same time***. A judicial proceeding may include multiple offenses and transactions.

204 Pa. Code § 303.2. (emphasis added).

- 35 -

… Appellant's erroneous interpretation of [Section] 303.5 confuses concurrent sentences or confinement with concurrent sentencing proceedings. Those legal terms of art are not the same. As [Section] 303.2 makes clear, … Appellant in the instant case had two separate judicial proceedings, not one. He was convicted and sentenced on the [b]urglary charge at one judicial proceeding more than 21 months before his [m]anslaughter conviction was pending before the New York court for sentencing in a separate judicial proceeding. To have been considered part of one judicial proceeding under the [g]uidelines, both offenses would have had to have been pending "before the court for sentencing at the same time." [204 Pa. Code § 303.2(b).] The fact that the judge who ultimately sentenced … Appellant on the [m]anslaughter charge permitted the [m]anslaughter sentence to be served concurrently with the previously-sentenced [b]urglary charge is irrelevant under the [g]uidelines.

Therefore, the points assigned to … Appellant's two New York convictions were properly aggregated to determine his [PRS].

Commonwealth's Brief at 71-73.

We agree with the Commonwealth's analysis. Appellant's argument simply ignores that his sentences for his two New York convictions, although ultimately set to run concurrently, stemmed from entirely separate judicial proceedings. Because Appellant's burglary and manslaughter convictions from New York arose from separate judicial proceedings, Section 303.5(b)(1) did not apply and, therefore, the trial court was not required to only count the more serious of those offenses towards its calculation of Appellant's PRS in this case. As such, we conclude that Appellant's sixth claim is meritless.

## **VII.**

Finally, Appellant asserts that the trial court erred in denying his motion *in limine*, in which he sought to exclude testimony from Chief Easter and Sergeant Koons indicating their belief that Sales' wound was consistent with

his having been stabbed by a knife or similar weapon. Appellant contends that, because neither witness was qualified as a medical or forensics expert, and because they did not witness the stabbing, the court abused its discretion by permitting the officers to testify as to the cause of Sales' wound.

Pa.R.E. 701 provides that:

If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:

(a) rationally based on the witness's perception;

(b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and

(c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Pa.R.E. 701.

Rule 702 provides that:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge is beyond that possessed by the average layperson;

(b) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; and

(c) the expert's methodology is generally accepted in the relevant field.

Pa.R.E. 702.

Here, the trial court determined that the witnesses' testimony was admissible because both officers had the requisite training and experience to

identify that Sales' wound was consistent with a stab wound caused by a knife or similar, edged weapon:

> [Appellant] next assigns error to our denial of his [m]otion *in limine* in which he asked us to preclude the testimony of Chief Easter and Sergeant Koons to the effect that Sales had sustained a "stab" wound caused by a knife or some other edged object. [Appellant] argues that the officers were not qualified as experts to present such testimony. However, neither officer offered that Sales' wound was definitely caused by [a] stabbing with a knife or some type of edged weapon, but only testified that the wound appeared to be consistent with having been caused in that manner.
>
> Chief Easter testified that he had extensive training and experience in identifying types of wounds through his long-term position as a law enforcement officer and from his service in the military. []N.T.[,] 5/26/21, at 9-10[.] He explained that he had observed numerous stab wounds during his service in Vietnam. [*Id.*] at 17[.] He had also taught a course on edged weapons to police cadets. [*Id.*] at 5-6[.] He described the appearance of wounds inflicted with an edged weapon, such as a knife, and explained the difference between wounds inflicted with a knife and a puncture wound. [*Id.*] at 6[.] He testified that Sales' injuries were consistent with a stab wound. [*Id.*] at 14[.] We believe that Chief Easter demonstrated that he had the requisite knowledge from his training and experience to render this testimony and we see no error in its admission.
>
> Sergeant Koons testified that he saw Sales' wound when he responded to the report of Sales l[]ying on the ground in Northern Lebanon after the Incident. [*Id.*] at 135[.] Sergeant Koons explained that the wound was clean, like a slice, and was bleeding quickly. [*Id.*] Sergeant Koons confirmed that he had 32 years of experience in law enforcement and that, during that time, he had dealt with many stab victims and had observed many stab wounds. [*Id.*] at 136-[]37[.] He testified that Sales' wound was consistent with a stab wound and with having been inflicted with an edged weapon. [*Id.*] at 136[.] We believe that Sergeant Koons also demonstrated that he possessed the requisite training and experience to offer this statement.

TCO at 9-10.

Appellant argues that Chief Easter and Sergeant Koons were not properly qualified as experts because the Commonwealth ostensibly failed to establish that they had medical training, or "specialized training or experience in recognizing stab wounds." Appellant's Brief at 68, 69. Appellant contends that this case is controlled by *Commonwealth v. Harper*, 230 A.3d 1231 (Pa. Super. 2020).

In *Harper*, police responded to a report of a shooting, but "there was no shooting in progress and no one present was involved in the shooting." *Id.* at 1234. "However, the police recovered three .40-caliber Smith & Wesson casings and nine 9-millimeter casings from the scene." *Id.* Around the same time, Harper presented at a hospital with a gunshot wound to the knee. *Id.* While at the hospital, Harper was visited by Officer Moffatt. At trial, Officer Moffatt testified that "he believed, based on his experience and his observation of 'the angle and location' of the wound, that [Harper] had 'a self-inflicted gunshot wound.'" *Id.* Harper's trial counsel failed to object to this testimony. Based on that testimony, as well as incriminating statements made by Harper to Officer Moffatt, Harper was convicted of firearms offenses. *Id.*

In the appeal from the denial of his Post Conviction Relief Act (PCRA)[15] petition, Harper successfully demonstrated that his trial counsel was ineffective for failing to seek suppression of his inculpatory statements to

---

[15] 42 Pa.C.S. §§ 9541-9546.

Officer Moffatt, and for failing to object to those statements at trial pursuant to the *corpus delicti* rule. ***Id.*** at 1236-41. In his third claim for relief, Harper also asserted that his trial counsel was ineffective for failing to object to Officer Moffatt's opinion that Harper's gunshot wound was self-inflicted, arguing that

> Officer Moffatt could have testified, as a lay witness, about his observation that [Harper] had a wound in his knee. However, [Harper] claims, an opinion that [he] sustained a self-inflicted gunshot wound would encompass not only a medical diagnosis, but also forensic science. [Harper] emphasizes no foundation was laid for this testimony and Officer Moffatt was not qualified as an expert.

***Id.*** at 1241.

This Court agreed, finding arguable merit to Harper's ineffectiveness claim because,

> the pertinent portion of Officer Moffatt's testimony was beyond the scope of lay testimony permitted by Rule of Evidence 701(c). An opinion that a gunshot wound was self-inflicted would require specialized expert medical and forensic training. ***See*** Pa.R.E. 702(c). Aside from a vague reference to his "experience" and "the angle and location" of [Harper]'s wound, as well as his uncorroborated opinion that the wound was "[f]rom the top of the knee down towards the foot," Officer Moffatt offered no medical or forensic observations of the wound, nor any medical or forensic theories supporting his opinion.

***Id.*** at 1242.

Appellant argues that ***Harper*** "is similar to the present matter[,] as [Chief] Easter [and Sergeant Koons] also had no specialized training or experience in recognizing stab wounds." Appellant's Brief at 69. We disagree.

In ***Harper***, Harper acknowledged that Officer Moffatt could have testified as a lay witness that Harper had a wound to his knee. The specific

testimony that the *Harper* Court found had exceeded the bounds of Rule 701(c), which governs the opinion testimony of lay witnesses, was that the wound had been self-inflicted. As noted by the *Harper* Court, that testimony required some medical or forensic expertise, and the Commonwealth failed to lay a foundation establishing that Officer Moffatt had any such expertise.

Here, by contrast, the trial court found that both Chief Easter and Sergeant Koons had the requisite training and experience to testify to their opinions that Sales' wound was consistent with having been caused by a knife or similar edged weapon. While they did not purport to be medical experts, both witnesses testified that they had extensive experience observing wounds caused by knives due to their careers in law enforcement and the military. Thus, their testimony was admitted under Rule 702 due to their special training and experience, and not as the opinion testimony of lay witnesses under Rule 701. As such, *Harper* is distinguishable.

Appellant argues that the officers had no specialized training or experience in recognizing stab wounds, but the record simply belies that contention. Both witnesses testified that they had experience recognizing stab wounds, laying a foundation that established specialized training that was simply absent from the record in *Harper*, where no foundation was laid to support Officer Moffatt's opinion testimony. Moreover, we do not believe that the mere observation that a wound is consistent with having been caused by an edged weapon requires the same level of medical or forensic expertise as

- 41 -

is required to determine whether a gunshot wound was self-inflicted. Thus, we would also find that *Harper* is distinguishable for that reason, as well.

Accordingly, we conclude that Appellant has failed to meet his burden of demonstrating that the trial court abused its discretion by admitting the officers' testimony that Sales' wound was consistent with a stabbing caused by a knife or similar weapon. Nor do we ascertain any abuse of discretion in the court's determining that the officers' specialized training was sufficient to qualify them to offer those opinions. Thus, we conclude that the contested opinion testimony was permissible under Rule 702 due to the officers' extensive experience observing stab wounds.

In any event, we agree with the Commonwealth that, even if the officers' testimony was not admissible, Appellant was not prejudiced by the admission of those opinions because they were merely cumulative of the uncontested medical opinions of two physicians. As the Commonwealth argues:

> [E]ven if it were improper for the officers to offer the challenged observations, their testimony on this issue was cumulative of similar, expert opinion testimony offered by two expert witnesses at trial: Drs. Moore and Fitzgerald. Both physicians, whose expert qualifications were not challenged by Appellant at trial or on appeal, testified, to a reasonable degree of medical certainty, that [Sales'] wound was the result of a stabbing. Dr. Fitzgerald's expert opinion was even more specific: she opined that the victim had been stabbed with a knife. Thus, even if the officers' testimony regarding the nature of the victim's wound was admitted in error, that error was harmless, and so Appellant is not entitled to a new trial. ***See Commonwealth v. West***, [834 A.2d 625, 634 (Pa. Super. 2003)] ("Not all errors at trial, however, entitle an appellant to a new trial, and [t]he harmless error doctrine, as adopted in Pennsylvania, reflects the reality that the accused is entitled a fair trial, not a perfect trial….");

> ***Commonwealth v. Watson***, [945 A.2d 174, 177 (Pa. Super 2008)] (holding that harmless error exists when "the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence"); ***Commonwealth v. Smalls***, 980 A.2d 549, 562 (Pa. 2009) ([stating that the] admission of improper testimony can be deemed harmless error, if the testimony is merely cumulative of other properly admitted evidence).

Commonwealth's Brief at 80-81.

Because the disputed testimony by Chief Easton and Sergeant Koons was cumulative of the unchallenged expert testimony by Drs. Moore and Fitzgerald, **see** N.T., 5/26/21, at 184-85 (Dr. Moore's testifying, to a reasonable degree of medical certainty, that Sales was stabbed); **id.** at 199 (Dr. Fitzgerald's testifying, to a reasonable degree of medical certainty, that Sales was stabbed), we agree with the Commonwealth that, even if the officers' opinion testimony was inadmissible under Rule 702, that error was harmless. Accordingly, Appellant is not entitled to relief on this claim.

Judgment of sentence **affirmed**.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/21/2022